UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CEDRIN WINGO,

                     Plaintiff,

v.

MICHIGAN BELL TELEPHONE
COMPANY, a domestic
corporation, and CHRISTOPHER
DWYER, an individual,

                     Defendants.
_____/

Case No. 16-cv-12209

Paul D. Borman
United States District Judge

Stephanie Dawkins Davis
Magistrate Judge

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF #31)

## I.    INTRODUCTION

This is a workplace discrimination suit filed by Plaintiff Cedrin Wingo, a former

Customer Service Specialist ("CSS") in wire splicing for Defendant Michigan Bell

Telephone Company, Inc. ("Bell"). On June 15, 2016, Plaintiff filed a four-count

Complaint alleging:

> Count I – Race Discrimination (Title VII);
> Count II – Race Discrimination (ELCRA);
> Count III – Retaliation (Title VII); and
> Count IV – Retaliation (ELCRA).

(ECF #3.)

Plaintiff contends that Defendant Christopher Dwyer, Plaintiff's direct supervisor between September 2013 and November 2015, issued significantly more disciplinary actions to Plaintiff on the basis of his race, up to and including termination. Plaintiff filed two Equal Opportunity Employment Commission ("EEOC") charges alleging racially discriminatory discipline and a third EEOC charge claiming retaliatory discipline.

Dwyer cited Plaintiff for numerous infractions between September 2013 and November 2015, at which point Plaintiff was suspended pending termination for failure to comply with the terms of an October 2015 Back-to-Work Agreement ("BTWA"). After filing a grievance concerning the termination with his union, Plaintiff was ultimately terminated in February 2016 after the review process resulted in a finding of just cause for Bell's decision.

Before the Court is Defendants' Motion for Summary Judgment, requesting dismissal of Plaintiff's discrimination and retaliation claims, which are raised under both Title VII and Michigan's Elliot-Larsen Civil Rights Act ("ELCRA"). As an initial matter, Dwyer as an individual cannot be liable under Title VII, so all claims brought against him under that statute are dismissed. As to the remaining claims (ELCRA violations against Dwyer and Bell, and Title VII violations against Bell), Plaintiff has neither raised genuine issues of material fact on his discrimination claims at the *prima facie* stage, nor has he demonstrated that the reasons proffered by

Defendants for the disciplinary actions up to and including termination were pretextual. While Plaintiff has established a *prima facie* case of retaliation, he has failed to adduce sufficient evidence that Defendants' reasons for their conduct were pretextual.

On June 5, 2018, Defendants jointly filed the instant Motion for Summary Judgment. (ECF #31.) Plaintiff filed his Response on July 11, 2018. (ECF #36.) On July 31, 2018 Defendants filed their Reply. (ECF #41.) For the reasons discussed in detail below, the Court GRANTS Defendants' Motion for Summary Judgment.

## II.  BACKGROUND

### A.  Plaintiff's Employment with Bell

Plaintiff, an African-American male, had been employed with Bell since 1998 as a CSS, a technician position in the construction category. (Pl. Dep., 29:9, PgID 235, ECF #31-2; Pl. Dep., Ex. A-1, PgID 231, ECF #31-3.) CSSs (also referred to as "splicers") install, connect, maintain, dismantle and rearrange aerial and/or buried telephone plants and associated wires and cables, including telephone poles. (Pl. Dep., Ex. A-1, PgID 231, ECF #31-3.) CSSs work out of various Bell garage locations. The percentage of African American CSSs managed by Dwyer during Plaintiff's tenure was between 40 and 50 percent. (*Id.* at 56:9-17, PgID 241, ECF #31-2; Dwyer Dep., 28:19-31:8, PgID 410-11, ECF #31-23.)

Defendant Dwyer was initially hired by Bell as a CSS in 2001, and in 2005, he became a manager. (Dwyer Dep., 10:14-19, 13:8-11, PgID 406, ECF #31-23.) Dwyer was moved to the Pontiac garage as a Level One Construction Manager in September 2013. (*Id.* at 23:23-24:3, PgID 409.) Dwyer was Plaintiff's Level One Manager and direct supervisor from September 2013 until Plaintiff's termination in February 2016. (*Id.* at 25:21-24.) Dwyer reported to Area Manager/Level Two Manager Marlon Redd (an African American male). (Pl. Dep., 50:12-14, 51:18-20, ECF #31-2.)

CSSs such as Plaintiff agreed to various company codes and procedures. These included the Code of Business Conduct ("COBC") and the Midwest Construction and Engineering Non-Management Employee Expectations (also known as the "Tech Expectations Policy"). (*Id.*, Ex. A-3, ECF #31-5.) Violations of either the COBC or the Tech Expectations Policy could result in the implementation of Bell's progressive discipline policy. (Dwyer Dec., ¶¶9-11, PgID 459, ECF #31-24.)

## B. Disciplinary History Under the Progressive Discipline Policy

Coaching and verbal warnings preceded progressive discipline steps. (Dwyer Dep., 39:6-43:3, PgID 413, ECF #31-23.) Discipline steps included written warnings, written warnings with suspensions of varying durations, final written warnings with suspension, and termination. (*Id.*) A Level One Manager was required to discuss the proposed step with the Area Manager and the Employee Resource Manager ("ERM"). (*Id.* at 129:12-130:7, PgID 435-36, ECF #31-23.)  The Area Manager would suggest

the step to the ERM, and the ERM would make the ultimate decision as to the action taken. (*Id*. at 129:12-131:2, PgID 435-36, ECF #31-23.) A CSS could then grieve the discipline through the Communication Workers of America Union ("CAU"). (Dwyer Dec. ¶11, PgID 459, ECF #31-24.) The CAU and Bell were signatories to a collective bargaining agreement, which dealt in part with the progressive discipline guidelines and grieving any discipline steps or pre-discipline action through the CAU. (Salvatore "Sam" Coletti Dep., 36:1-23, PgID 516, ECF #31-28.)

Dwyer testified that, "We do take into consideration mitigative [sic] circumstances where we may repeat a [discipline] step, or a step may be reduced through the process of grievances…." (Dwyer Dep., 91:16-92:9, PgID 426, ECF #31-23.) The ERM never disagreed with the Area Manager regarding discipline issued to Plaintiff by Dwyer. (*Id*. at 131:3-8, ECF #31-23.) Plaintiff, a CAU member and a Union Steward for over six years,[1] testified that he grieved every discipline he received. (Pl. Dep., 164:24-25, PgID 268, ECF #31-2.)

Plaintiff was disciplined 14 times from September 2013 through his final suspension pending termination on November 5, 2015. He also received multiple verbal warnings and coaching sessions during that timeframe. (As mentioned above,

---

[1] Plaintiff was a Union Steward from 2002 to 2008 and again for six months in 2013 while he was located at the Pontiac garage. (Pl. Dep., 43:1-18, PgID 238, ECF #31-2.)

verbal warnings and coaching are not considered official "discipline.") Plaintiff's progressive discipline under Dwyer proceeded as follows:

- Sept. 16, 2013 – Written Warning and Three-Day Suspension for falsely reporting work completed and misusing 49 minutes of company time in July 2013. (Pl. Dep., Ex. A-6, PgID 326, ECF #31-6.) These COBC violations were allegedly committed by Plaintiff while he was "on loan" to a Lansing project. (*Id*.) The Lansing manager reported the violations to Dwyer, who was responsible for issuing the discipline upon Plaintiff's return to Pontiac. Plaintiff grieved the discipline, and after the completion of the grievance procedure, it was found that Bell acted with just cause. (*Id*. at Ex. A-6, PgID 328, ECF #31-6.) Plaintiff did not recall any meetings regarding the discipline, grieving the discipline, or the outcome. (*Id*. at 64:12-69:2, PgID 243, ECF #31-2.)

- Oct. 23, 2013 – Second Written Warning and Three-Day Suspension for COBC Violation/Tech Expectations Policy. (*Id*. at Ex. A-7, PgID 330, ECF #31-7.) Dwyer disciplined Plaintiff for technical deficiencies in work, falsification of time records, and misuse of company time on October 9 and 10, 2013. (*Id.*) This was

a repeat of a disciplinary step offered without progression out of "good faith." (Dwyer Dep., 62:20-24, PgID 419, ECF #31-23.) Plaintiff did not recall receiving the discipline, grieving the discipline, or the outcome. (Pl. Dep., 73:20-75:18, PgID 245-46, ECF #31-7.)

- Mar. 27, 2014 – Written Warning with One-Day Suspension for Violation of Tech Expectations Policy. Plaintiff received an operational practices violation for leaving his work truck unsecured (an "OP-78" violation) on March 21, 2014. (*Id*. at Ex. A-8, PgID 334, ECF #31-8.) Plaintiff grieved the discipline but does not recall an outcome. (*Id*. at 82:17-20, PgID 248, ECF #31-2.)

- Sept. 15, 2014 (Non-Discipline) – Verbal Warning/Performance Measured Document. Dwyer provided Plaintiff a verbal warning and report reflecting that he had not met performance metrics for November and December 2013, and January, February, and July 2014. (The February performance failure was waived due to a "missed opportunity.") Plaintiff does not recall the warning or his grievance thereof, but he admitted to missing objectives at times. (*Id*. at 84:2-89:25, PgID 248-49, ECF #31-2.)

- Oct. 3, 2014 – Written Warning with One-Day Suspension for Violation of Tech Expectations Policy. This was issued for another alleged OP-78 violation discovered by Dwyer on October 2, 2014. (*Id*. at Ex. A-10, ECF #31-9.)

- Jan. 20, 2015 – First Written Warning and One Day Suspension for Violation of Safety Practices. Plaintiff received this discipline for failure to wear a hard hat while operating in an elevated work position. (*Id*. at Ex. A-11, ECF #31-10.) Plaintiff admitted committing (and grieved) this violation. (*Id*. at 94:4-16, PgID 251, ECF #31-2.)

- Jan. 29, 2015 (Non-Discipline) – Verbal Warning for Violation of a Work Error. The record of this warning discussed Plaintiff's alleged failure to place sufficient gravel in work pedestals, labeling deviations, improper warning stickers, and defects in the grounding and support of the splices performed. (*Id*. at Ex. A-12, ECF #31-11.) Plaintiff claims no recollection of this project, warning, or grievance. (*Id*. at 107:12-108:10, PgID 254, ECF #31-2.)

- Mar. 16, 2015 – Final Written Warning with Three Day Suspension for Violation of Tech Expectations Policy. Again,

Plaintiff received discipline for an OP-78 violation regarding an unsecured work vehicle. Bell's violation record states that the vehicle was left idling with the keys in the ignition, and bins holding work equipment were unlocked. (*Id*. at Ex. A-13, PgID 352, ECF #31-12.) Plaintiff testified that he has no reason to dispute the Employee Response, in which Plaintiff admitted that he "forgot to turn [the vehicle] off while loading supplies before returning to the office to do training." (*Id*. at 111:16-112:4, PgID 255, ECF #31-2.)

- Apr. 13, 2015 – Final Written Warning with Four-Day Suspension for Violation of Tech Expectations Policy. This discipline was issued after Dwyer discovered Plaintiff's work vehicle unsecured on April 8 and 10, 2015. Additionally, the letter issued to Plaintiff states that on April 9, 2015, Plaintiff drove his truck on to a customer's lawn against management directives, causing damage at cost to Bell. (*Id*. at Ex. A-14, PgID 357-62, ECF #31-13.)

- May, 1 2015 (Non-Discipline) – OP-78 Demonstration and Review. Dwyer had a discussion with Plaintiff about leaving his truck unlocked. When Dwyer inspected Plaintiff's truck with him, Dwyer found the truck locked, but the combination locks were set

to their combinations so they could be pulled open. Dwyer instructed Plaintiff not to do so in the future. (*Id*. at Ex. A-15, PgID 364, ECF #31-14.) The report of the conversation indicated that Plaintiff "understood and said he would lock them properly." (*Id.*) Plaintiff stated that he has no recollection of this particular event but knows he participated in other OP-78 reviews with Dwyer. (*Id*. at PgID 132.)

- May 7, 2015 (Non-Discipline) – Discussion of Safety Expectations and Time Management. On May 5, 2015, Marlon Redd and Dwyer spoke with Plaintiff, Kenneth Williams, and Marcus Bailey about various equipment deficiencies (Plaintiff, Bailey, and Williams), safety violations (Bailey and Plaintiff), and work efficiency (Bailey and Plaintiff) on a project. (*Id*. at Ex. A-16, PgID 366, ECF #31-15.)

- May 11, 2015 (Non-Discipline) – Discussion with Dwyer about missing timesheet for May 8, 2015. (*Id*. at138:18-141:3, PgID 262, ECF #31-2.)

- May 27, 2015 (Non-Discipline) – Safety Coaching regarding tool use. (*Id*. at 141:4-143:7, PgID 262, ECF #31-2.)

- June 11, 2015 – Final Written Warning with Three-Day Suspension for Violation of a Work Practice. Plaintiff received discipline for failing to properly test a splice case on May 26, 2015. The report of Dwyer's conversation with Plaintiff at the time stated that Plaintiff admitted he did not test the case. (*Id*. at Ex. A-19, PgID 370, ECF #31-16.) A wire subsequently became wet, causing a loss of service to 134 circuits and 123 land line customers. The error required an estimated 550 man hours to resolve. (*Id.*) Plaintiff did not believe, however, that he was responsible for all of the errors on the project. Plaintiff later testified at his deposition that Coletti told him that Dwyer had someone move that case, which caused the leak. It was Plaintiff's personal belief that no one else was disciplined for these events, but in fact, there was an investigation and Marcus Bailey was also disciplined. (*Id*. at 149:18-23, PgID 264, ECF #31-2; Dwyer Dep., 100:21-23, PgID 428, ECF #31-23.)

- June 22, 2015 – Written Warning and One-Day Suspension for Violation of COBC. An investigation revealed that Plaintiff had reported a job complete that was not in fact finished. (Pl. Dep.,

157:8-158:21, PgID 267-68, ECF #31-2; *Id.* at Ex. A-20, PgID 374-79, ECF #31-17.)

- Aug. 19, 2015 – Final Written Warning with Three-Day Suspension for Violation of COBC. A co-worker reported to Dwyer that Plaintiff had kicked and damaged that co-worker's work vehicle. Plaintiff called Dwyer a liar and did not allow him to finish reading a discipline letter before Plaintiff left the building. (Pl. Dep., 158:23-164:8, PgID 267-68; *id.* at Ex. A-21, PgID 383, ECF #31-18.) During an August 18, 2015 investigative conversation, Plaintiff stated that he "did not recall having kicked the truck, but that [h]e thinks [the co-worker who reported the incident] was telling the truth." (*Id.* at PgID 382.)

- Sept. 17, 2015 – Suspension Pending Termination for Violations of COBC and Tech Expectations Policy. (*Id.* at Ex. A-23, PgID 389, ECF #31-19.) Plaintiff met with Dwyer, Marlon Redd, Ben Locher, and Sam Coletti on September 2, 2015 to discuss various infractions. (*Id.* at PgID 390.) On September 1, 2015, Plaintiff left a "work rodeo" 30 minutes early, and on August 31, September 2, and 3, 2015, he had not turned in timesheets. (*Id.*) At the September 2, 2015 meeting and at his deposition, Plaintiff

12

admitted that leaving the work rodeo early was a "stupid mistake." (*Id.*; Pl. Dep., 170:16-23, PgID 270, ECF #31-2.) The grievance report stated that Bell had just cause for termination. Regardless, the grievance was settled under the terms of the BTWA, executed October 12, 2015. (*Id.* at Ex. A-23, PgID 389, ECF #31-19; Ex. A-24, PgID 395, ECF #31-20.)

- Nov. 5, 2015 – Termination for Violations of Tech Expectations Policy, COBC, and BTWA. Dwyer notified Plaintiff that he was being terminated for failure to comply with the terms of the BTWA due to the following infractions on October 20, 2015: (1) time management; (2) leaving vehicle idling while at the Central Office; (3) taking unauthorized late lunch; (4) exceeding allotted time for lunch; (5) failing to return to jobsite post-lunch; (6) falsifying time reporting and charging unworked time to an assigned project; and (7) parking work vehicle in the same lot as three other technicians during lunch. (*Id.* at Ex. A-25, PgID 397, ECF #31-21.) Bell's investigation materials of the violations included GPS tracking data from Plaintiff's work vehicle. (Dwyer Dec., Ex. C-3, PgID 486, ECF #31-27.) On February 2, 2016, the grievance finding was

that Bell terminated Plaintiff with just cause.  (Pl. Dep., Ex. A-25, PgID 399, ECF #31-21.)

Plaintiff testified at his deposition that he grieved all of his disciplines, including instances where he admitted to committing the violation. (*E.g.*, Pl. Dep., 99:18, PgID 252, ECF #31-2; *id.* at Ex. A-23 (admitted departing work training event early was a "stupid mistake"); *id.* at Ex. A-11 (admitted failing to wear hard hat when required).) Several of his grievances resulted in a finding of just cause for Bell and/or in settlement with Bell and the CAU, typically where the warning would be reduced or dropped within less than a year if Plaintiff committed no similar infractions.

Regarding Dwyer's approach to discipline, fellow CSS and CAU Regional Vice President Sam Coletti testified that Dwyer strictly followed the Management Guide to Corrective Action. (Coletti Dep., 48:7-17, Resp. Ex. 4, PgID 683, ECF #36-3.) Coletti testified that Dwyer issued more discipline than prior managers across the board, and that discipline was not selective as to race:

> A:  The thing about Mr. Dwyer, I'll be honest, I was not a fan of Mr. Dwyer as manager. Mr. Dwyer not only disciplined [Plaintiff] but Mr. Dwyer disciplined a lot of us. People that never had discipline before or been years [sic]. Mr. Dwyer went strictly by what was written. There was no deviation to him. So Mr. Dwyer had a lot of issues with a lot of people because of how he viewed things. […]

> (Plaintiff's Counsel) Q:   If there is testimony in this case that in fact Mr. Dwyer came down more heavily on African American splicers than Caucasian splicers, would you say

that you are in a position to know that or would you deny it or agree with it?

A:      I would have to deny it.

(Coletti Dep., 31:20-32:2, 32:24-334, PgID 515, ECF #31-28.)

Coletti also played a significant role in ensuring that the discipline and grievance procedures were properly followed on behalf of CAU bargaining unit employees such as Plaintiff. Coletti testified that he ensured that the policy and procedures were followed, including with respect to Plaintiff:

(Defense Counsel) Q:      You testified that you were a regional [Vice President] for the [CAU] since 2006.

A:      Correct.

Q:      And as part of your duties as regional VP is that you participate in grievance meetings on behalf of bargained-for employees.

A:      That is correct.

Q:      Do you also participate in investigatory meetings that an employee's manager may have with an employee?

A:      Yes.

Q:      And is it your job as regional VP to represent employees in matters of discipline generally?

A:      Yes.

Q:      Would you call yourself an advocate for the bargained-for employees?

A:      Yes.

Q:      The purpose in being an advocate for your employees during the disciplinary meetings, the purpose of your involvement is to ensure that the Collective Bargaining Agreement is followed.

A:      That is correct.

Q:      And if, in fact, the Collective Bargaining Agreement was not followed, then you'd have to take some kind of action.

A:      That is correct.

Q:      And part of the rights that bargained-for employees, including [Plaintiff] have, under the Collective Bargaining Agreement have to do with progressive discipline.

A:       True. Yes.

Q:      And you in fact did that for [Plaintiff], correct?

A:      Yes.

Q:      And you attended a number of [Plaintiff]'s grievance meetings throughout your tenure.

A:      Yes.

(Coletti Dep., 35:10-36:23, PgID 516, ECF #31-28.)

## C.      Plaintiff's EEOC Charges

In October 2013, Plaintiff filed a race discrimination charge with the EEOC ("2013 Discrimination Charge") approximately a few weeks after Dwyer became manager at the Pontiac garage and disciplined Plaintiff at the request of a Lansing manager for whom Plaintiff had worked. (Dwyer Dep., 32:21-33:16, PgID 411, ECF #31-23.) Plaintiff filed a second race discrimination charge on August 18, 2015 ("2015

Discrimination Charge"), the day of the meeting regarding damage to a work vehicle. (Resp. Ex. 5, PgID 688, ECF #36-4.) The 2015 Discrimination Charge related to discipline following a June 22, 2015 event where Plaintiff had reported an incomplete project as complete. (*Id.*)

It is not completely clear what Plaintiff claims the retaliatory discipline was or when it began. On September 21, 2015, Plaintiff filed a charge alleging retaliation ("Retaliation Charge"). The Retaliation Charge claimed that retaliatory discipline dated back to November 24, 2014,[2] but the narrative stated that retaliation began following the 2013 Discrimination Charge. (Resp. Ex. 6, PgID 690, ECF #36-5.) The Complaint alleges that "after the [2015 Discrimination Charge], Plaintiff was retaliated against by Defendant Dwyer issuing more bogus discipline against Plaintiff." (Compl. ¶19, ECF #3.) At his deposition, however, Plaintiff testified that he did not know when the complained-of retaliation began:

> (Defense Counsel) Q:    So you're saying you're not sure if the retaliation occurred after your first EEOC as opposed to occurring after your second and third EEOC charge? Is that what you're saying? I just want to make I understand what you're saying.
>
> A:    What I'm saying is, I'm not sure when the retaliation started, whether it was after the first one or after the second one. I don't remember.

---

[2] November 25, 2014 is exactly 300 days prior to the date the 2015 Discrimination Charge was filed, coincidentally capturing the maximum period of time within the statute of limitations.

(Pl. Dep., 215:25-216:8, PgID 281, ECF #31-2.)

Therefore, the Court will consider alleged disciplinary action that is not time-barred.

## IV.  STANDARD OF REVIEW

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). A fact is "material" for purposes of a summary judgment motion where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (quoting *Kendall v. Hoover Co*., 751 F.2d 171, 174 (6th Cir. 1984)). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it

18

believes demonstrate the absence of a genuine issue of material fact." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 247 (6th Cir. 1991) (internal quotation marks omitted) (quoting *Celotex*, 477 U.S. at 323). If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

"The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal citations and quotation marks omitted). The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of

fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586–587 (1986) (footnote and internal quotations omitted).

In making the determination on summary judgment whether there are genuine issues of material fact for trial, the court must draw all reasonable inferences in favor of the non-moving party. *See Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc*., 398 F.3d 555, 558 (6th Cir. 2005)). At the same time, plaintiff must produce enough evidence to allow a reasonable jury to find in his favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute is not enough." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008) (quoting *Mitchell v. Toledo Hosp*., 964 F.2d 577, 582 (6th Cir. 1992)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

Ultimately, the party who bears the burden of proof must present a jury question as to each element of the claim. *See Davis*, 226 F.3d at 511. Plaintiff cannot meet that burden by relying solely on "[c]onclusory assertions, supported only by [his or her]

own opinions." *Arendale v. City of Memphis*, 519 F.3d 587, 560 (6th Cir. 2008).

Plaintiff must show probative evidence, based "on more than mere speculation, conjecture, or fantasy," to prevail. *Id.* at 601 (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir.2004)).

All evidence submitted in opposition to a motion for summary judgment must ultimately be capable of being presented in a form that would be admissible at trial:

> The submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial. Otherwise, affidavits themselves, albeit made on personal knowledge of the affiant, may not suffice, since they are out-of-court statements and might not be admissible at trial. *See* Fed. R. Evid. 801(c), 802. However, the party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary. Such "'evidence submitted in opposition to a motion for summary judgment must be admissible.'" *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quoting *United States Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir.1997)). That is why "'[h]earsay evidence . . . must be disregarded.'" *Ibid*. It is also the basis of this court's repeated emphasis that unauthenticated documents do not meet the requirements of Rule 56(e).

*CareSource*, 576 F.3d at 558-59 (internal citations omitted).

## V.    ANALYSIS

### A. Individual Liability under Title VII and ELCRA

Defendants are correct that Counts I and III of the Complaint should be dismissed as to Dwyer. Plaintiff has brought causes of action under Title VII against Dwyer individually. Dwyer, however, is not subject to liability as an individual

employee or supervisor otherwise qualifying as an employer under Title VII. *Wathen v. Gen. Elec. Co*., 115 F.3d 400, 405 (6th Cir. 1997).

Title VII provides that "it shall be an unlawful employment practice for an employer" to discriminate on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a). A person aggrieved by such discrimination may bring a civil action against the "employer." 42 U.S.C. § 2000e–5(b). "Employer" is defined to mean "a person engaged in an industry affecting commerce who has fifteen or more employees ... *and any agent of such person.*" 42 U.S.C. § 2000e(b) (emphasis added). "Agent" is not defined by Title VII but has been interpreted as "an individual who serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment." *Wathen* at 405. The majority of courts addressing this issue have concluded that "[t]he obvious purpose of this agent provision was to incorporate respondeat superior liability into the statute." *Id.* at 405-06. Notably, Title VII's remedies are available from employers only (*e.g.*, back pay and reinstatement), and the statute does not provide for any damages paid by individual defendants. *Id.* at 406. Thus, the Sixth Circuit has held that, except for narrow sets of circumstances, individuals such as Dwyer are not liable under Title VII. *Id. See also Pettinato v. Professional Patient Care*, No. 16-cv-14419, 2017 WL 2930915, at *3-4 (E.D. Mich. July 10, 2017) (slip copy) (Drain, G.) (Defendant owner/CEO not individually liable).

22

Contrarily, ELCRA does not categorically bar claims against an individual defendant who is an agent of a defendant employer. MCL 37.2201(a) defines "employer" as a corporation that has "one or more employees, and includes an agent of that" corporation. Therefore, individual agent liability may exist even if it does not exist under Title VII because agents are considered employers under ELCRA. *Elezovic v. Ford Motor Co.*, 472 Mich. 408, 426, 697 N.W.2d 851, 861 (2005). Dwyer, as an agent of Bell, may therefore be liable under ELCRA. Accordingly, the Court will not dismiss Counts II and IV as to Dwyer for lack of individual liability.

## B. Discrimination Under Title VII and ELCRA

Defendants argue that Plaintiff has failed to establish a *prima facie* case of race discrimination under Title VII and under ELCRA. Even assuming Plaintiff had established a *prima facie* case, Defendants contend that Bell has articulated a legitimate, non-discriminatory reason for Plaintiff's discharge and that Plaintiff has failed to produce any evidence suggesting this was a pretext for unlawful discrimination.

Generally speaking, a plaintiff in a race discrimination action "has the burden of proving by a preponderance of the evidence a *prima facie* case." *Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir. 2000) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981)). After proving the existence of a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason

for the adverse action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–3 (1973). If the defendant meets this burden, the plaintiff must then show that the defendant's articulated reason is a pretext for discrimination. *Id.*

### 1. *Prima Facie* Case

Plaintiff must establish a *prima facie* case consisting of four elements: (i) that he was a member of a protected class; (ii) that he was qualified for his position; (iii) that he suffered an adverse employment action; and (iv) that he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside the protected class. *See Johnson v. University of Cincinnati*, 215 F.3d 561, 572–73 (6th Cir. 2000); *Town v. Michigan Bell Telephone Co.*, 455 Mich. 688, 695, 568 N.W.2d 64, 68 (1997).

Defendants contend that Plaintiff cannot satisfy the fourth element necessary to set forth a *prima facie* case: either that he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside the protected class. Plaintiff maintains that not only was he replaced by two Caucasian CSSs, but also that Dwyer consistently disciplined him more harshly than similarly situated Caucasian co-workers.

### a. Similarly Situated Individuals

Plaintiff has failed to point to any similarly-situated individuals who were either disciplined less harshly or not terminated. In the context of a discriminatory discipline

or termination claim, "'similarly situated' means that that 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Parries v. Makino, Inc.*, 148 F. App'x 291, 296 (6th Cir. 2005) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir. 1992)). To make out a case of disparate treatment, the plaintiff must produce *specific facts* showing he and the non-minority employee engaged in similar conduct. *Id.* at 297. Where an employer uses a system of progressive discipline, the disciplinary history of a plaintiff is critical to evaluating disparate treatment. *Berry v. City of Pontiac*, 269 F. App'x 545, 549 (6th Cir. 2008) (plaintiff could not show that two proposed comparators were similarly situated when their progressive disciplinary history was not as extensive as plaintiff's history).

Plaintiff testified that his knowledge of other employees' discipline was based on undocumented, non-specific conversations and/or his personal belief that individuals were not disciplined or less harshly disciplined in circumstances otherwise comparable to his own. *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) ("[T]he ultimate ... question as we indicated in McDonnell Douglas, [is whether] an allegation that 'other employees involved in acts against (the employer) of comparable seriousness ... were nevertheless retained."). This "evidence" is insufficient to

preclude summary judgment. *Curry v. SBC Communications, Inc.,* 669 F. Supp. 2d 805, 827 (E.D. Mich. 2009) ("The record contains nothing more than [plaintiff's] conclusion that white employees were treated differently than her, with no basis to assess the propriety of the alleged comparators.").

For example, Plaintiff admitted to lacking firsthand knowledge of other employees' discipline beyond purported conversations with employees, any details of which he now cannot remember. (Pl. Dep., 100:7-102:23, PgID 254-53, ECF #31-2.) Moreover, he admitted learning, generally, that other employees *were* disciplined for leaving work trucks unsecured. (*Id*. at 98:2-4, PgID 252, ECF #31-2.) Defendants have also produced documentation of Caucasian employees who were disciplined for similar infractions under the progressive discipline policy. (Dwyer Dec., Ex. C-1, PgID 463-74, ECF #31-25.) Moreover, Plaintiff testified that he 'believed' his work vehicle was secured each time he was disciplined and that Dwyer was indeed lying every time he issued Plaintiff an OP-78 citation. (Pl. Dep., 96:15-97:25, PgID 251, ECF #31-2.)[3]

---

[3] (Defense Counsel) Q: You're basing your statement, I think my truck was secured, is because you think Mr. Dwyer is a liar? [Sic.]
A: Correct.
Q: Okay. Is there anything else you're basing that belief on?
A: No.
(Pl. Dep., 97:18-25, PgID 251, ECF #31-2.)

Further, Plaintiff received a Final Written Warning and Three-Day Suspension for a COBC Violation when he kicked and damaged another co-worker's truck. (Pl. Dep., Ex. A-25, ECF #31-18.) Not only did Plaintiff have prior COBC violations on his record warranting the severity of the discipline, but other employees were in fact disciplined for damage to their vehicles, including Eugene Kegley (Caucasian) and Eric Mathieson (Caucasian). (Dwyer Dec. Ex. C-1, PgID 467, 473, ECF #31-24). Yet, Kegley and Mathieson's vehicle incidents were deemed preventable accidents as opposed to purposeful damage. (*Id.*) Their conduct was different than Plaintiff's and considered less serious. "The fact that other employees broke *other* rules – even ones perhaps appearing as serious as the ones with which [Plaintiff was] charged – does not aid [Plaintiff] in identifying a similarly situated individual." *Curry* at 827 (emphasis added).

Plaintiff also stated in his Interrogatory Responses that he "never saw or heard of a white employee being blamed or disciplined for leaving his or her vehicle unlocked…."[4] (Resp. Ex. 7, Interrogatory Resp. #3, PgID 698, ECF #36-6.) Contrary

---

[4] Federal Rule of Civil Procedure Rule 56 provides that interrogatory answers may be considered as evidence during summary judgment. *Lauderdale v. Wells Fargo Home Mortg.*, 552 F. App'x 566, 571 (6th Cir. 2014). In order to be considered, however, such evidence must be sworn or made under the penalty of perjury. *Id.* The copy of Plaintiff's interrogatory responses attached as an exhibit to his Response (Resp., Ex. 7, ECF #36-6) is unsigned and not notarized. Because Defendants have not objected and as the Court would grant Defendants' Motion even if the document complied with requirements, the Court will assume a notarized version was exchanged between the Parties during discovery. *See CareSource* at 560. Moreover, the

to Plaintiff's speculation, Kegley also received progressive discipline from Dwyer for failing to secure his work vehicle on two occasions, so he was not treated differently. (Dwyer Dec., Ex. C-1, p. 10, PgID 471, ECF #31-25.)

Interrogatory Response Number Three also mentions discipline issued on February 2, 2015[5] involving placement of gravel: "[the Caucasian splicers in my department] regularly placed the same amount of gravel above as I did, but none were ever issued a discipline about it." (Resp. Ex. 7, Interrogatory Resp. #3, P. 7, PgID 698, ECF #36-6.) The discipline was as a result of gravel placement *in addition to* improper labelling/warning sticker placement, defects in the proper care of the grounds, and defects in support of the splices. At his deposition, Plaintiff testified that he has no recollection of this event, grieving the warning, or the outcome of the grievance, let alone the specific facts as to how a similarly situated Caucasian CSS was treated more favorably after committing the same violations. (Pl. Dep., 106:17-108:18, PgID 254, ECF #31-2.)

As an additional example of unfounded assertions, Plaintiff personally believed that no one else was disciplined for a June 2015 leak that caused an outage to over 120 customers, yet Marcus Bailey (African American) was also disciplined. (Pl. Dep.,

---

depositions attached by Parties are not authenticated under Rule 56, but neither Plaintiff nor Defendants have objected.

[5] This is likely meant to reference a January 29, 2015 warning letter referring to gravel placement and other violations.

149:18-23, PgID 264, ECF #31-2; Dwyer Dep., 100:21-23, PgID 428, ECF #31-23.) It was also determined during the inquiry (which included Mike Wilson, a manager who was involved with investigations) that Chuck Schwerin, whom Plaintiff proposed as a comparator, was working on a different task, so he was not disciplined for the leak. (Dwyer Dep., 100:21-101:6, PgID 428, ECF #31-23.)

Further, Plaintiff testified that he was unsure whether the other employees (all African American) with him on October 12, 2015 were disciplined – those employees were indeed each issued a one-day suspension. (Dwyer Dep., 116:19-117:14, PgID 432, ECF #31-23.) Those other employees were not similarly situated, most notably because they were not under the strict terms of a BTWA.

Plaintiff has not pointed to a similarly-situated individual with respect to a single violation, nor has he pointed to an individual with a similar disciplinary history who was treated differently. Plaintiff instead relies solely on inadmissible hearsay and interrogatory responses that fail to substantiate his conclusory statements and personal beliefs. *See CareSource*, 576 F.3d at 558-59 (hearsay evidence must be disregarded). Therefore, he has not satisfied the requirements of the fourth element of a circumstantial *prima facie* case. *Singfield v. Akron Metro. Housing Authority*, 389 F.3d 555, 562 (6th Cir. 2004) ("Because none of the employees cited allegedly engaged in the range of activities for which [Plaintiff] was disciplined, no employee is similarly situated.").

### b. Replacement by an Individual Outside the Protected Class

Plaintiff has also failed to demonstrate a question as to whether he was replaced by an individual outside of his protected class. In the Sixth Circuit, a person is considered replaced only when another employee is hired or reassigned to perform the plaintiff's duties; a person is not considered replaced when his/her duties are absorbed by another person or when the work is redistributed among other existing employees already performing related work. *Opengeym v. HCR Manor Care*, No. 14-CV-13037, 2016 WL 1637711, at *4 (E.D. Mich. Mar. 30, 2016), report and recommendation adopted *sub nom. Opengeym v. Care*, No. 14-13037, 2016 WL 1623990 (E.D. Mich. Apr. 25, 2016), aff'd *sub nom. Opengeym v. Heartland Employment Servs., LLC*, No. 16-1614, 2017 WL 5495714 (6th Cir. Jan. 30, 2017).

Dwyer testified that Plaintiff was not replaced after his termination "because it wasn't necessary to backfill a vacant headcount." (Dwyer Dep., 53:4-13, PgID 416, ECF #31-23.) When Bell lost a manager at its location in Clawson, the company redistributed the 12 splicers who had worked under that manager to other garages. (Dwyer Dep., 53:9-16, PgID 416, ECF #31-23.) Area Manager Marlon Redd made the decision to take in two splicers from the Clawson garage – he did not decide *which* splicers would come to the Pontiac garage. Under the terms of the collective bargaining agreement, the two splicers with the highest seniority who selected Pontiac transferred to that location. (Dwyer Dep., 137:3-20, PgID 437, ECF #31-23.)

Therefore, the terms of the collective bargaining agreement determined which two splicers – who were Caucasian – were to go to Pontiac from Clawson. *MacDonald v. United Parcel Serv.*, 430 F. App'x 453, 459 (6th Cir. 2011) ("Ordinarily, a replacement selected pursuant to a collective bargaining agreement does not give rise to an inference of discrimination.").

### c. Pretext

In order to demonstrate that an employer's reason for an adverse action was pretextual, a plaintiff must produce evidence that the employer's justification: (1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action. *Sharp v. Aker Plant Servs. Grp., Inc.*, 600 F. App'x 337, 344 (6th Cir. 2015).

Defendants have provided legitimate business reasons for Plaintiff's discipline and termination, including documentation of Plaintiff's protracted history of infractions, progressive disciplinary steps that included "second chances" granted by Bell and/or negotiated through CAU grievances, several findings that Bell acted with just cause, and finally, admitted violations of Plaintiff's BTWA. Bell has also provided records reflecting that other employees were disciplined for infractions similar to or the same as Plaintiff's. Plaintiff, however, has not set forth grounds that would lead a reasonable juror to believe that Bell's reasons were pretextual.

Plaintiff makes much ado about Dwyer's failure to explain the disparity between the number of disciplines issued to Plaintiff by previous managers and himself. As discussed, Dwyer strictly adhered to Bell's disciplinary policy. (Coletti Dep., 31:24-25, PgID 515, ECF #31-28.) Dwyer's unfamiliarity with prior managers' decisions does not constitute evidence of disparate treatment or pretext. Plaintiff's CAU representative Coletti testified that he did not believe that Dwyer was motivated by racial animus. Indeed, Dwyer disciplined more employees across the board. (Coletti Dep., Ex. D, 31:20-33:4, PgID 515-16, ECF #31-28.)

Plaintiff has not provided any evidence suggesting that race factored in to Bell's decision-making whatsoever, and therefore there is no triable issue of race discrimination under Title VII or ELCRA.

## C. Retaliation Under Title VII and ELCRA

In Counts III and IV, Plaintiff alleges retaliatory discipline. Absent direct evidence of retaliatory motive, Plaintiff's initial burden in proving a claim of retaliation under Title VII or ELCRA is to establish the four elements of a *prima facie* case: (i) that he engaged in "protected activity" within the meaning of these statutes; (ii) that this exercise of protected activity was known to his employer; (iii) that he suffered an adverse employment action; and (iv) that there was a causal connection between the protected activity and the adverse action. *See DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004); *Garg v. Macomb County Community*

*Mental Health Services*, 472 Mich. 263, 273, 696 N.W.2d 646, 653 (2005). The Supreme Court has held that Title VII retaliation claims require proof that the desire to retaliate was the "but-for" cause of the challenged employment action. *Univ. of Texas Southwestern Medical Ctr. v. Nassar*, 570 U.S. 338, 360 (2103). *See also Mys v. Michigan Dep't of State Police*, 886 F.3d 591, 600 (6th Cir. 2018).

### 1. *Prima Facie* Case – Causal Connection

To establish a causal connection, Plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had he not complained of discrimination. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). "[E]vidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Id.*

### a. Similarly Situated Employees

There is no genuine issue of material fact establishing that Plaintiff was treated differently from similarly situated employees, discussed *supra*, for purposes of his discrimination claim or to establish a causal connection between any protected conduct and alleged retaliatory actions. Plaintiff stated in his Retaliation Charge that he believes the discipline and suspensions were as a result of his complaints of race discrimination. (Resp. Ex. 6, PgID 690, ECF #36-5.) These complaints would presumably include the 2015 Discrimination Charge and Plaintiff's statements about

his work environment post-November 24, 2014 (*see* Section III(B), *supra*), but he has not produced any example of a similarly situated employee who was treated differently.

In fact, both Plaintiff and Vincent Johns (African American) separately approached their CAU representative, Coletti, to discuss what they believed to be racially discriminatory disciplinary actions by Dwyer. (Coletti Dep., 23:7-25:6, PgID 513-14, ECF #31-28.) Coletti followed protocol and took their concerns to Dwyer. (*Id.*) Johns also filed an EEOC charge relating to Dwyer (but purportedly not involving race discrimination). (Dwyer Dep., 18:4-23, PgID 408, ECF #31-23.) Plaintiff, however, has presented no evidence that Johns (or any other employee) was more harshly disciplined by Dwyer following a complaint.

### b. Temporal Proximity

Causal connection may also be shown by temporal proximity. Where an adverse employment action occurs "very close in time" after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation. *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 650 (6th Cir. 2015). But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality. *Id.*

*See also Beauvais v. City of Inkster*, No. 16-CV-12814, 2017 WL 5192249, at \*12 (E.D. Mich. Nov. 9, 2017) (Drain, G.).

Case law in the Sixth Circuit has been inconsistent over the years about when temporal proximity, standing alone, can establish a causal connection. In *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 776-77 (6th Cir. 2018), however, the Sixth Circuit recently clarified when temporal proximity alone can support causality:

> In this case, Rogers filed her first EEOC charge on July 3, 2013. Adams met with Rogers and referred her to a fitness-for-duty exam on September 11, 2013. This is sufficient temporal proximity to establish a causal connection. *See Seeger v. Cincinnati Bell Tel. Co.,* 681 F.3d 274, 283-84 (6th Cir. 2012) (collecting cases holding that a *two-to-three month time lapse* between a plaintiff's protected activity and occurrence of a materially adverse action is sufficient temporal proximity to satisfy a plaintiff's prima facie case of retaliation).

(Internal citations to record omitted; emphasis added).

Even though temporal proximity of two to three months alone may support the causal element of a *prima facie* case of retaliation, an "intervening legitimate reason to discipline" an employee can defeat that inference. *Fletcher v. U.S. Renal Care*, 709 F. App'x 347, 353 (6th Cir. 2017) (quoting *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012)).

Here, Plaintiff has not established a causal connection based on prolonged temporal proximity plus the requisite additional evidence between any complaints and the pre-termination discipline. There is, however, sufficiently close temporal

proximity between the two 2105 EEOC charges and the suspension pending termination to establish the causal connection element on that basis alone. Plaintiff's retaliation claim nevertheless fails because there was an intervening legitimate reason for the termination.

### i. Pre-Termination Discipline

Plaintiff testified that he complained about a hostile work environment to Dwyer "a couple of times" but does not identify when he complained. (Pl. Dep., 223:13-224:6, PgID 283, ECF #31-2.) Plaintiff also testified that he complained to Redd, Rudy Hobbs, and Christopher Banko (Dwyer's Area Manager until early 2014 (Dwyer Dep., 66:22-67:10, PgID 420, ECF #31-23)) about a "hostile work environment," but again, he is not specific as to timeframes, number of times, or any resultant adverse action. (Pl. Dep., 218:18-226:13, PgID 283, ECF #31-2) (testimony regarding "hostile work environment" discussions).)[6] These complaints are in addition to Plaintiff's three EEOC charges.

The Retaliation Charge complains that the termination as well as *every* instance of discipline issued by Dwyer were discriminatory. (Pl. Resp., Ex. 6, PgID 690, ECF #36-5.) Plaintiff has not provided details of protected conduct (besides the 2015 EEOC

---

[6] There are no allegations of hostile work environment in the EEOC charges or the Complaint.

charges) sufficient to raise an issue of fact that the discipline would not have occurred but for the purported complaints. *Nassar* at 360.

As discussed *supra,* in Section III(C), Plaintiff cannot decisively state when the retaliatory discipline began. (Pl. Dep., 215:25-216:8, PgID 281, ECF #31-2.) Further, the Retaliation Charge alleges that the adverse conduct began on November 25, 2014, but the narrative states that it began immediately following Plaintiff's 2013 Discrimination Charge. Notwithstanding these inconsistencies, he fails to tie any instances of pre-termination discipline to protected conduct. For example, Plaintiff testified that he complained to Christopher Banko in or around Thanksgiving 2014 about a "hostile work environment," but he does not point to any adverse action (or additional evidence of discrimination) taken in response to that complaint. (*Id*. at 224:16-225:11, PgID 283, ECF #31-2.)

### ii.  November 5, 2015 Suspension Pending Termination

Nonetheless, the close temporal proximity alone of Plaintiff's 2015 Discrimination Charge, Retaliation Charge, and November 5, 2015 Suspension Pending Termination for Violations of the Tech Expectations Policy, COBC, and BTWA is sufficient to support the causal connection prong of the retaliation claims. Defendants, however, have adduced sufficient evidence to rebut this *prima facie* showing.

Plaintiff lodged his 2015 Discrimination Charge on August 18, 2015. The September 19, 2015 suspension pending termination was issued one month later. Plaintiff filed his Retaliation Charge on September 21, 2015. The September 19, 2015 discipline, however, was resolved by allowing Plaintiff to return to work on October 12, 2015 under the terms of the BTWA executed that day – after Bell obtained knowledge of both the 2015 Discrimination Charge and the Retaliation Charge.

On November 5, 2015, approximately one month after Plaintiff filed the 2015 Retaliation Charge, he was again suspended pending termination for – admittedly – violating the terms of the BTWA on October 20, 2015, only eight days after returning to work. Plaintiff's violations of the BTWA constitute an intervening non-retaliatory basis for termination. Further, the CAU grievance procedure again resulted in a finding of just cause for Bell's decision to terminate Plaintiff.

Therefore, Plaintiff has established a *prima facie* case of retaliation due to the close temporal proximity of the 2015 Discrimination Charge, the Retaliation Charge, and his termination, but Defendants have successfully offered a legitimate, intervening, non-discriminatory reason for its action in rebuttal.

## 2. Pretext

Plaintiff has not provided sufficient evidence the Defendants' proffered reasons were pretextual, as discussed in Section V(B)(1)(c), so his retaliation claims fail. Plaintiff was terminated after a protracted history of discipline that utilized Bell's and

the CAU's protocol. Plaintiff admitted the infraction that ultimately placed him on his initial suspension pending termination (leaving the work rodeo early). Plaintiff also admitted, at the very least, that he did not obtain management authorization for a late lunch on October 20, 2015 in violation of company policy and his BTWA, which led to his termination.

To the extent Plaintiff contends that temporal proximity refutes Defendants' facially valid reasons for disciplining and, ultimately, terminating Plaintiff, this argument fails. Although temporal proximity alone may sometimes establish the causation element of a *prima facie* case, it cannot establish pretext. *Krumheuer v. GAB Robins N. Am., Inc.*, 484 F. App'x 1, 5 (6th Cir. 2012). Plaintiff has offered no evidence of discriminatory retaliation in addition to the timing of his 2015 Discrimination and Retaliation Charges and Defendants' actions. Thus, the Court dismisses Counts III and IV.


## VI.    CONCLUSION

IT IS ORDERED that Defendants' Motion for Summary Judgment is GRANTED because Plaintiff has neither set forth a *prima facie* case of race discrimination, nor could a reasonable jury could find that Defendants' reasons for disciplining or terminating Plaintiff were pretextual for retaliation. Moreover, all Title

VII claims against Defendant Christopher Dwyer are dismissed *ab initio* because the statute does not provide for individual liability.

IT IS SO ORDERED.

Dated:  January 2, 2019

s/Paul D. Borman
Paul D. Borman
United States District Judge